Amy Wilkins Hoffman (SBN 022762)
**HOFFMAN LEGAL, LLC**
99 E. Virginia Ave., Ste. 220
Phoenix, AZ  85004
Tel.   (623) 565-8851
ahoffman@hoffmanlegalaz.com

Marc E. Kasowitz (*Admitted pro hac vice*)
Daniel J. Fetterman (*Admitted pro hac vice*)
Thomas J. Amburgy (*Admitted pro hac vice*)
Fria Kermani (*Admitted pro hac vice*)
**KASOWITZ BENSON TORRES LLP**
1633 Broadway
New York, NY  10019
Tel: 212-506-1934
Fax: 212-500-3434
MKasowitz@kasowitz.com
DFetterman@kasowitz.com
TAmburgy@kasowitz.com
FKermani@kasowitz.com

*Counsel for Nikola Corporation*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Nikola Corporation, a Delaware corporation, | Case No.: 2:24-cv-00563-DJH |
| Plaintiff, | **AMENDED COMPLAINT** |
| vs. | |
| Trevor R. Milton and Chelsey Milton, husband and wife, and Utah residents | |
| Defendants. | |

Plaintiff Nikola Corporation ("Nikola" or "Company"), for its claims against

Defendants Trevor R. Milton ("Milton") and Chelsey Milton, by and through its

undersigned counsel, hereby alleges as follows[1]:

**<u>INTRODUCTION</u>**

1.      This is a straightforward action under the Uniform Fraudulent Transfer Act, as adopted by Arizona ("AUFTA"),[2] to preserve Nikola's ability to recover an over $165 million award, plus pre-judgment interest, issued by a three-member panel of arbitrators in favor of Nikola and against Milton (the "Arbitration Award"), in an arbitration held under the auspices of the American Arbitration Association ("AAA"), Case No. 01-21-0017-1964 (the "Arbitration").

2.      While Nikola's Petition to Confirm the Arbitration Award and For Entry of Judgment is *sub judice* with this Court (*see Nikola v. Milton*, No. CV-23-02635-PHX-DJH (D. Ariz.)) (the "Confirmation Action"), Milton has taken efforts to frustrate, hinder, and delay Nikola's efforts to collect on the Arbitration Award by, among other things, selling and/or transferring nearly 51 million shares of Nikola stock, with a market value of approximately $35 million (the "Transfers"), based on available Depository Trust Company settlement data ("DTC Data") that tracks sales/transfers of Nikola stock.[3]

---

[1] Verification of this Complaint is pending due to the discovery dispute submitted to the Court's attention on April 29, 2024 [Doc. No. 40], which, among other things, concerns the parties' disagreement over whether documents and information referenced herein and designated by Milton as "CONFIDENTIAL – ATTORNEYS' EYES ONLY" may be viewed by Nikola Corporation's in-house counsel, who verified Nikola's initial complaint.
[2] Other states, including Utah, Nevada, and New York, have adopted either the Uniform Fraudulent Transfer Act or the nearly identical Uniform Fraudulent Conveyance Act.  *See, e.g.*, Arizona Revised Statutes § 44-1101 *et seq*; Utah Code § 25-6-101 *et seq*; Nevada Revised Statutes § 112.140 *et seq*; NY Debt. and Cred. Law § 270 *et seq*.

[3] The DTC is a central securities depository that, among other things, (i) provides electronic record-keeping of securities balances, (ii) acts as a clearinghouse to process and

2

3.     The Transfers are rife with "badges" of fraud including that they occurred after Nikola brought its arbitration demand and very shortly after the arbitration panel issued the Arbitration Award against Milton, and before Milton may incur additional substantial debts in connection with, among other things, his criminal conviction for securities fraud and wire fraud.  Although Milton has failed to comply with this Court's expedited discovery Orders, the scant production he *has* made reflects an obvious attempt to maintain possession or control of the shares through an intra-family transfer.

4.     Accordingly, Nikola brings this action seeking relief from any and all fraudulent transfers Milton has made since the filing of the Demand and to enjoin Milton from fraudulently transferring and dissipating his assets.

## PARTIES, JURISDICTION, AND VENUE

5.     Nikola, a publicly traded corporation duly organized and existing under the laws of the state of Delaware, with its principal office located in Phoenix, Maricopa County, Arizona, manufacturers heavy-duty semi-trucks that run on alternative fuels, such as battery-electric vehicles and fuel-cell electric vehicles.

6.     Milton, a resident of Utah, is Nikola's founder and one of its largest individual shareholders.  Milton served as Nikola's Chief Executive Officer ("CEO") until June 2020, when Nikola became publicly traded, after which he served as its Executive Chairman until his resignation in September 2020.  Milton was a member of Nikola's

_____

settle almost all corporate, equity, and money market securities in the United States, and (iii) provides brokers and financial institutions with a daily record of net settlement obligations at the end of each day from trading.

Board of Directors until his resignation in September 2020.

7.      Defendant Chelsey Milton is the wife of Trevor R. Milton, and, upon information and belief, is a resident of Utah.  Upon information and belief, the acts of Trevor R. Milton as alleged herein were for the benefit of the marital community, and, upon information and belief, Chelsey Milton knew of, participated in, consented to, and/or ratified the acts of Trevor R. Milton as alleged herein.

8.      This Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1332 because the parties are citizens of different states and the amount in controversy exceeds $75,000.

9.      Venue in this judicial district and the exercise of personal jurisdiction over Milton by this Court is proper: (i) pursuant to 28 U.S.C. § 1391 because Milton expressly aimed his conduct at Nikola knowing that Nikola is located in Arizona, and harmed (and continues to harm) Nikola in Arizona, the forum state, by attempting to prevent Nikola from obtaining a meaningful judgment pursuant to the Confirmation Action before this Court; and (ii) because the parties expressly consented, in a separation agreement between Nikola and Milton, dated September 20, 2020 ("Separation Agreement") to the "exclusive jurisdiction, forum and venue of the state and federal courts located in the State of Arizona" (*see* **Exhibit A**, ¶¶ 19, 20), and this action relates directly to the Confirmation Action, which Milton does not dispute falls under Paragraphs 19 and 20 of the Separation Agreement, in that this matter relates to Nikola's ability to recover on the Arbitration Award that is the subject of the Confirmation Action.

## ALLEGATIONS OF FACT

**I.    The Underlying Arbitration & Judgment Against Milton**

10.    On November 3, 2021, Nikola initiated an arbitration proceeding by filing an arbitration demand against Milton (the "Demand").

11.    The parties' dispute in the underlying Arbitration arose from Milton breaching his fiduciary duties to Nikola, including his duties of loyalty and good faith, by intentionally and knowingly spreading mistruths, and reaping enormous personal profits from his wrongdoing.  Milton's serial lies and breaches of fiduciary duty directly led to a whistleblower reporting his misconduct to the SEC, and a short-seller cataloging dozens of his lies in a public report—the Hindenburg Report—published on September 10, 2020, which in turn led to a deluge of subpoenas, regulatory investigations, and civil actions that caused Nikola massive harm and damages, a small portion of which Nikola sought to recover through the Arbitration.

12.    Within just over two weeks of being served with the Demand, Milton began selling shares of Nikola stock, selling approximately 15 million shares worth about $164 million over an 11-day period, according to SEC Form 4 filings.  Indeed, since August 2021, beginning shortly after Milton was indicted for securities and wire fraud by the U.S. Attorney's Office for the SDNY ("Criminal Action") through November 2021—shortly after Nikola's commencement of the Arbitration—SEC Form 4 filings reflect that Milton sold or gave away more than $317 million worth of Nikola stock that he beneficially owned directly through a company wholly owned and controlled by Milton, M&M Residual LLC ("M&M").

13.     Milton also has a history of selling/transferring Nikola stock for no consideration.  In July 2021, just days before the federal indictment against him was unsealed, Milton, according to SEC Form 4 filings, transferred approximately 1,750,000 shares of Nikola stock (with a total approximate value of nearly $24.5 million) to his spouse for $0.

14.     Because Milton's stock sales/transfers threatened Nikola's ability to obtain the relief it sought in the Arbitration, on December 2, 2021, Nikola moved before the AAA for emergency relief seeking a temporary restraining order and a preliminary injunction to maintain the status quo and prevent Milton from further selling or otherwise transferring his shares of Nikola stock until the conclusion of the Arbitration.  Nikola ultimately withdrew its emergency application <u>following Milton's agreement that he would not sell any Nikola stock, directly or indirectly, during the pendency of the Arbitration absent at least seven (7) days' notice</u>.

15.     Both parties thereafter spent substantial time and effort litigating the factual and legal disputes between them, and, on November 17, 2023, the arbitration panel issued and served a signed copy of the Arbitration Award, finding that Milton violated his fiduciary duties of loyalty and good faith to Nikola, and finding Milton liable for damages in excess of $165 million (plus pre-judgment interest).

16.     On December 18, 2023, Nikola initiated the Confirmation Action in this Court by filing a petition for confirmation of the Arbitration Award and for entry of judgment.  (*See* Confirmation Action, ECF No. 1.)  Milton filed a Motion to Vacate or Modify Arbitration Award on January 22, 2024, which has been fully briefed as of

February 12, 2024 and remains *sub judice*.  (*See* Confirmation Action, ECF Nos. 21, 31, and 32.)

**II.    Milton is Exposed To Considerable Monetary Liability From His Misconduct**

17.    On October 14, 2022, Milton was convicted of securities fraud and wire fraud in the Criminal Action, and on December 18, 2022, Milton was sentenced to four years in prison, three years of supervised release, ordered to forfeit a property in Utah, and ordered to pay a fine of $1 million.  (*See* Judgment, *U.S. v. Milton*, Case 1:21-cr-00478-ER, ECF No. 327 (S.D.N.Y., Jan. 17, 2024).)  At the sentencing, the court in the Criminal Action also ordered the government to submit within 90 days a proposed restitution order, which also may subject Milton to additional monetary liability.  (*See* Minute Entry for proceedings in *U.S. v. Milton*, Case 1:21-cr-00478-ER (S.D.N.Y., entered on January 16, 2024 and filed on December 18, 2023).)

18.    Milton also is a defendant in numerous pending civil actions stemming from the same misconduct that formed the basis of his criminal conviction and Nikola's Demand, including, but not limited to: *Borteanu v. Nikola Corp.*, *et al.*, No. 2:20-cv-01797-SPL (D. Ariz., filed Sept. 15, 2020); *In re Nikola Corp. Derivative Litigation*, No. 20-cv-01277-CFC (D. Del., filed Sept. 23, 2020); *Huhn v. Milton, et al*., No. 2:20-cv-02437 (D. Ariz., filed Dec. 18, 2020); *In re Nikola Corp. Derivative Litig.*, Consol. C.A. No. 2022-0023-KSJM (Del. Ch., filed Jan. 7, 2022); and *Hicks, et al. v. Milton, et al*., 2:22-cv-00166 (D. Utah, filed Mar. 14, 2022)*.*  Although these actions remain pending, they may result in significant monetary judgments against Milton given his criminal conviction and the Arbitration Award.

### III. Milton Appears to Fraudulently Sell/Transfer Shares of Nikola Stock on the Cusp of Confirmation of the Arbitration Award

19.     Facing potentially staggering criminal and civil liability, and on the cusp of this Court likely confirming the Arbitration Award and entering a judgment against Milton for over $165 million (plus pre-judgment interest) in favor of Nikola, Milton has systemically transferred nearly all of his shares of Nikola stock held in M&M on a continuing weekly basis to hinder and delay Nikola's ability to collect on the Arbitration Award.

20.     As shown in figure 1 below, based on available DTC data, despite not having purchased or sold shares of Nikola stock since August 2022, shortly after Nikola initiated the Confirmation Action, Milton, through M&M, sold/transferred 46,923,834 shares of Nikola stock worth approximately $32 million before the filing of this action on March 15, 2024.  Milton continued to brazenly siphon off an additional four million shares between Nikola's filing of a Temporary Restraining Order on March 19 to restrain such sales, and the oral argument thereon.  In total, Milton has transferred nearly 51 million shares of Nikola stock with a market value of approximately $35 million to frustrate, hinder and delay Nikola's ability to collect on those shares.  As of March 26, 2024, according to available DTC data, M&M holds approximately 86,000 shares of Nikola stock—a mere 0.2% of the shares held before the Transfers.

*Figure 1*

| Date | Shares Sold | Share Price* | Total Value |
|---|---|---|---|
| Week of 2/22 – 2/24 | 22,343,679 | 0.7043 | $  15,737,397.91 |
| Week of 2/29 – 3/06 | 7,910,636 | 0.7102 | $    5,618,133.69 |
| Week of 3/7 – 3/13 | 7,496,051 | 0.6640 | $    4,977,377.86 |
| Week of 3/14 – 3/20 | 9,173,468 | 0.6192 | $    5,680,211.39 |
| 3/19/2024 | Nikola files TRO application | | |
| Week of 3/21 – 3/26 | 4,037,514 | 0.7175 | $    2,896,916.30 |
| 3/26/2024 | Hearing on Nikola's TRO application | | |
| **TOTAL** | **50,961,348** | | **$ 34,910,037.15** |

*Based on the average closing price during each period.

## IV.    Milton Retains Possession or Control of the Sold/Transferred Nikola Stock Through Intra-Family Transfers Executed to Conceal His Assets From Nikola

21.    Although this Court denied Nikola's application for a TRO, it granted Nikola's request for expedited discovery concerning the Transfers as well as the assets and liabilities of Milton and his affiliates based on "the inferences of potential fraud in the record." (Doc. No. 29 at 10.)  Since the Court approved the expedited discovery regarding Milton's and his affiliates' assets and liabilities, Milton failed to comply with the Court's multiple Orders directing him to produce discovery concerning his assets (Doc. No. 29 at 11; Doc. No. 40 at 5), and asserted untimely, inappropriate and baseless objections to that discovery.  Yet, the scant production he has made concerning his assets reveals an apparent intra-family transfer designed to allow Milton to retain control of the shares.

22.    Milton's counsel has affirmed that an April 2, 2024, deposit into an account at Mountain America Credit Union for $32,454,972.34 "reflects the consideration for the transfers."  Yet, the description for the deposit states "[d]eposit Transfer From RB Trading

LLC," a reference to a Utah LLC in which Milton's **own father** is both the registered agent and the owner of the property at the address listed for that company.

23.    Based on these records, as of the TRO hearing on March 26, 2024, Milton had not received any consideration for the transfers from M&M to an affiliated entity of nearly 51 million shares—a fact that appears to be starkly inconsistent with his counsel's representation to the Court at the TRO hearing that the Nikola shares in M&M "have actually been sold into the open market" and that "[Milton] has no control over any of the shares that have been sold on the open market."  (Transcript of Temporary Restraining Order Hearing, 23:14, 28:6-7.)

24.    Given the timing and circumstances of the Transfers, Milton's ploy to further delay producing the Court-approved, expedited discovery concerning the Transfers and Milton's and his affiliates' other assets and liabilities, and the numerous badges of fraud surrounding the Transfers, this record reflects an attempt by Milton to delay, hinder, and defraud Nikola from recovering the Arbitration Award entered in favor of Nikola and against Milton.

**V.    Milton Expressed An Unequivocal Intent to Maintain Control of the Shares Through His "Notice of Intent" to Nominate A Slate of New Directors**

25.    On January 26, 2024, Milton—through M&M—sent to Nikola a "Notice of Intent" to nominate five individuals for election to Nikola's Board of Directors at Nikola's 2024 annual meeting of stockholders (the "Letter").  In the Letter, M&M was identified as the "Nominating Stockholder," and Milton was identified as the <u>only</u> "beneficial owner of [M&M] on whose behalf the nomination is being made."  The Letter also stated that M&M "is the direct beneficial owner of" over 51 million shares of Nikola stock, and that <u>all</u> of

the Nikola stock beneficially owned directly by M&M also is beneficially owned by Milton.  No other individual or entity—other than Milton—was identified as having any beneficial ownership of the shares of Nikola stock owned directly by M&M, which included the entirety of Nikola stock included in the Transfers.

26.    Given that Milton—through M&M—was seeking to nominate five individuals for election to Nikola's Board of Directors at Nikola's 2024 annual meeting, and, as one of Nikola's largest individual shareholders, presumably sought to maximize his voting power at the Annual Meeting, Milton must have intended to retain possession or control of the shares of Nikola included in the Transfers.

27.    On April 11, 2024, ***after*** the TRO hearing and the Court's expedited discovery order relating to Milton's alleged fraudulent transfers and Milton's belated receipt of consideration for the apparent transfer of approximately $35 million worth of M&M stock to an affiliated entity, Milton sent a letter to Nikola withdrawing the nomination notice.  Milton therefore appears to have arranged to make it seem like he had received full consideration for the Transfers (when in truth he had not) and abandoned his effort to wage a proxy contest through the shares that he had transferred to an affiliated company for which his father is the registered agent.

## COUNT I

### Fraudulent Conveyance / Transfer Pursuant to A.R.S. § 44-1004

28.     Nikola incorporates each of the foregoing allegations of this Verified Complaint as if fully set forth here.

29.     Milton is indebted and otherwise obligated to Nikola in an amount exceeding $165 million pursuant to the Arbitration Award.

30.     Milton has not paid any amounts to Nikola to satisfy the Arbitration Award since issuance of the Arbitration Award.

31.     Shortly after Nikola petitioned this Court to confirm the Arbitration Award, and enter judgement in conformity therewith, Milton made the Transfers with the actual intent to hinder, delay and defraud Nikola's efforts to collect on the Arbitration Award.

32.     The Transfers occurred shortly after a substantial debt was incurred.

33.     Milton did not receive adequate consideration or reasonably equivalent value in connection with the Transfers.

34.     Milton retains possession or control of the property sold/transferred after the Transfers.

35.     The Transfers were made with the intent to hinder and delay Nikola's ability to collect on the Arbitration Award, and to avoid having to satisfy the damages awarded to Nikola in the Arbitration Award.

36.     Pursuant to Ariz. Rev. Stat. § 44-1001 *et seq.*, the sale or transfer of stock valued at approximately $35,000,000 is voidable as a fraudulent transfer.

37.     As a result, Nikola has been damaged and is entitled to the remedies afforded to creditors pursuant to Ariz. Rev. Stat. § 44-1007 with respect to the Transfers.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### **PRAYER FOR RELIEF**

WHEREFORE, Nikola respectfully requests that the Court enter judgement for Nikola and against Milton and provide the following relief:

A.      An order permanently enjoining Milton, until and unless Milton fully satisfies the debt incurred in connection with the Arbitration Award, pursuant to Ariz. Rev. Stat. § 44-1007(A)(4)(a), against further disposition, of the assets sold/transferred or of any other asset or property, wherever located, that is: (i) owned, controlled, held by, in whole or in part, for the benefit of, or subject to access by, or belonging to Milton; (ii) in the actual or constructive possession of Milton; or (iii) in the actual or constructive possession of, or owned, controlled, or held by, or subject to access by, or belonging to, any other corporation, limited liability company, partnership, trust, association, enterprise or any other entity directly or indirectly owned, managed or controlled by, or under common control with, Milton, except in the ordinary course of business;

B.      An order setting aside the Transfers and any other fraudulent transfers of assets to the extent necessary to satisfy all amounts that Milton owes to Nikola pursuant to the Arbitration Award;

C.      An order of attachment, pursuant to Ariz. Rev. Stat. § 44-1007(A)(3), against the assets sold/transferred;

D.      An order of garnishment, pursuant to Ariz. Rev. Stat. § 44-1007(A)(l), against the fraudulent transferee or the recipient of the fraudulent obligation;

E.      A levy of execution, pursuant to Ariz. Rev. Stat. § 44-1007(B), on the assets sold/transferred or its proceeds;

F.     Costs and reasonable attorneys' fees and expenses; and

G.     Such other and further legal or equitable relief that the Court may deem just and proper under the circumstances.

Dated: April 30, 2024          Respectfully submitted,

**HOFFMAN LEGAL**

By  /s/ Amy Wilkins Hoffman    
Amy Wilkins Hoffman
99 E. Virginia Ave., Ste. 220
Phoenix, AZ  85004

Marc E. Kasowitz (*Admitted pro hac vice*)
Daniel J. Fetterman (*Admitted pro hac vice*)
Thomas J. Amburgy (*Admitted pro hac vice*)
Fria Kermani (*Admitted pro hac vice*)
**KASOWITZ BENSON TORRES LLP**
1633 Broadway
New York, NY  10019
Tel: 212-506-1934
Fax: 212-500-3434
MKasowitz@kasowitz.com
DFetterman@kasowitz.com
TAmburgy@kasowitz.com
FKermani@kasowitz.com

*Counsel for Nikola Corporation*

**CERTIFICATE OF SERVICE**

I hereby certify that on April 30, 2024, I lodged the attached document with the

Clerk's Office using the CM/ECF System, and provided a copy via email to:

Terence Healy
James Boykin
Shahzeb Lari
Hughes Hubbard & Reed, LLP
One Battery Park Plaza, 12th Fl.
New York, NY  10004-1482
Terence.healy@hugheshubbard.com
james.boykin@hugheshubbard.com
Shahzeb.lari@hugheshubbard.com
Counsel for Milton

Chad Hester
Troy Wallin
1760 E. Pecos Road, Ste. 332
Gilbert, AZ  85295
chester@wallinhester.com
twallin@wallinhester.com
Counsel for Milton

Dated: April 30, 2024                    By: /s/ Amy Wilkins Hoffman
                                              Amy Wilkins Hoffman

# EXHIBIT A

*Execution Version*

# AGREEMENT

THIS AGREEMENT (the "Agreement"), is made as of September 20, 2020 by and between Nikola Corporation, a Delaware corporation (the "Company"), and Trevor Milton (the "Executive" and together with the Company, the "Parties").

WHEREAS, the Executive is employed by the Company under terms set forth in that certain Executive Employment Arrangement, dated as of June 3, 2020, by and between the Company and the Executive (the "Employment Arrangement");

WHEREAS, the Executive has also been a member of the Board of Directors of the Company (the "Board") since June 3, 2020;

WHEREAS, the Executive desires to voluntarily step down from his positions as Executive Chairman of the Company and a member of the Board as of September 20, 2020 (the "Effective Date") and the Board, after deliberation, has accepted such offer to step down; and

WHEREAS, this Agreement sets forth the mutual understanding of the Parties as it relates to the relinquishment of the Executive's employment with the Company and service on the Board, each as of the Effective Date.

NOW, THEREFORE, in consideration of the mutual covenants, commitments and agreements contained herein, and for other good and valuable consideration the receipt and sufficiency of which is hereby acknowledged, the Parties intending to be legally bound hereby agree as follows:

1.    Voluntary Relinquishment.  The Executive hereby voluntarily hands over and otherwise relinquishes, and the Company accepts his relinquishment of, his position as Executive Chairman of the Company and all positions as an employee and officer of the Company and its subsidiaries (the "Company Group"), and his position as a Director on the Board and a director of any of the Company's subsidiaries, including all committees thereof effective as of the Effective Date and without the need for any other action.  The Employment Arrangement will be terminated and have no further effect on the Effective Date, except as set forth in this Agreement.  The Effective Date will be the Executive's final day of employment with the Company Group for benefit plan and all other purposes.  The parties agree that the Executive's relinquishment of his employment is not a termination of the Executive by the Company for purposes of any of the Executive's arrangements or otherwise.

2.    Consulting Services.  In exchange for the mutual agreements set forth in this Agreement, the Executive hereby agrees to remain an unpaid consultant of the Company and to make himself reasonably available to provide consulting services and to assist the Company, in each case as reasonably requested by the Board on an *ad hoc* basis through December 31, 2020.  The Company will reimburse the Executive for all reasonable and necessary out-of-pocket business and travel expenses incurred by the Executive in connection with the performance of the Executive's consulting duties hereunder in accordance with the Company's expense reimbursement policy for senior executives.

3.    <u>Certain Matters</u>.  To help preserve capital and assist the Company in retaining world-class talent to succeed the Executive, the Executive hereby relinquishes each of the following: (i) 100% of the 4,859,000 performance-based stock units (the "<u>PSUs</u>") granted to the Executive on August 21, 2020, (ii) any right or claim to enter into a two-year consulting agreement with an annual fee of $10,000,000 and (iii) any other right and entitlement that the Executive may have or claim pursuant to the Employment Arrangement, except as set forth in this Agreement. Executive acknowledges that as of the date hereof except for (A) 91,644,134 shares held by M&M Residual, LLC, which includes 6,005,139 shares subject to options held by certain employees pursuant to a Founder Stock Option Plan, (B) the PSUs and (C) the RSUs (as defined below), he has no other capital stock, or any options, warrants or other rights to acquire capital stock or other securities convertible into or exercisable for capital stock of the Company.

4.    <u>The Company's Commitments</u>.  Following the Effective Date, the Company agrees to (i) vest and settle, at a time selected by the Company but no later than March 15, 2021, in accordance with applicable documentation the restricted stock units (the "<u>RSUs</u>") granted to the Executive on August 21, 2020, (ii) comply with all indemnification and advancement of expenses obligations it has pursuant to the Company's certificate of incorporation and bylaws, each as amended through the date hereof, the Employment Arrangement, and the Indemnification Agreement, dated as of June 3, 2020, by and between the Company and the Executive (the "<u>Indemnification Agreement</u>"), (iii) pay for the reasonable costs of a security inspection of the Executive's residence, (iv) reimburse the Executive up to $100,000 in the aggregate for a full-time security detail for the Executive and his family for three months following the Effective Date, (v) reimburse the Executive in accordance with applicable Company policy for business expenses incurred on or before the Effective Date, and (vi) reimburse the Executive for his reasonable legal fees incurred in connection with the negotiation and drafting of this Agreement.

5.    <u>The Executive's Commitments</u>.

(a)    <u>Restrictive Covenants</u>.  The Executive hereby reaffirms the Executive's continuing obligations under the Employee Proprietary Information and Inventions Assignment Agreement attached as Exhibit B to the Employment Arrangement (collectively, the "<u>Restrictive Covenants Agreement</u>"), and acknowledges and agrees that the Restrictive Covenants Agreement will remain in effect in accordance with their terms following the Effective Date.  For the avoidance of doubt, the term of the Executive's obligations included in Sections 4(g), (h), (i) and (j) of the Restrictive Covenants Agreement shall be one year following the Effective Date.

(b)    <u>Cooperation</u>.  The Executive acknowledges and affirms the Company Group and/or the other Releasee's may be the subject of internal or external investigations, litigation, arbitration, or civil, governmental or other administrative proceeding involving the Company Group and/or the other Releasees (a "<u>Claim</u>").  The Executive will fully cooperate with the Company Group in investigating, defending or prosecuting any Claim; provided that the Executive will not be required to take any particular action if his counsel believes such action creates a conflict of interest between the Company Group and the Executive or otherwise exposes the Executive to claim or penalty.  The Company will pay for or reimburse the Executive for all of the Executive's out-of-pocket expenses incurred in connection with this Section 5(b) that have been approved in advance by the Company.  The Company will make all reasonable efforts to ensure that such assistance and cooperation will not materially interfere with the Executive's

employment and business responsibilities, including any fiduciary duties.  If Executive is the subject of an investigation, litigation, arbitration, or civil, governmental or other administrative proceeding involving his services to the Company (an "Executive Claim"), the Company will fully cooperate with the Executive in investigating, defending or prosecuting any such Executive Claim to the extent approved by the Company's counsel, which approval shall not be unreasonably withheld.

(c)    Social Media.  Following the Effective Date, the Executive will promptly revise the Executive's employment status on social media, including LinkedIn and other social media sites so that the Executive is no longer identified as holding any position with the Company or serving on the Board.  Prior to using any social media site, blog or other online platform to make any statements regarding the Company Group or any of their respective employees or directors (a "Statement"), the Executive agrees to consult with the Executive's counsel and the Company's Chief Legal Officer as may be reasonably necessary to determine that the Statement complies with the Executive's obligations to the Company.

6.    Mutual Non-Disparagement.  The Executive will not make any defamatory or disparaging statements about the Company, its board of directors, officers, management, practices, procedures, or business operations.  The Company will instruct its officers and directors that they shall not make any defamatory or disparaging statements about the Executive.  Nothing in this paragraph will prohibit the Executive or the Company from providing truthful information in response to a subpoena or other legal or regulatory process or any party from making internal statements in the course of performing services for the Company Group.  Further, the foregoing will not apply to any truthful statement a Party makes in response to a defamatory or disparaging statements made by the other Party (in the case of the Company, in its formal public statements or by its executive officers and/or its directors) regarding the responding Party so long as the responding Party's statements extend no further than addressing such statements by the other Party.

7.    Release by the Executive.  In exchange for the mutual promises in this Agreement, the Executive hereby releases and discharges and covenants not to sue the Company, its subsidiaries, parents, or affiliated corporations, past and present, and each of them, as well as each of its and their assignees, successors, directors, officers, stockholders, partners, representatives, insurers, attorneys, agents or employees, past or present, or any of them (individually and collectively, "Releasees"), from and with respect to any and all claims, agreements, obligations, demands and causes of action, known or unknown, suspected or unsuspected, arising out of or in any way connected with events, acts, conduct, or omissions occurring at any time prior to and including the Effective Date.  Notwithstanding the above, however, the Executive is not releasing (i) any claims that cannot be waived under applicable state or federal law, (ii) rights the Executive may have to indemnification and/or expense advancement (including, without limitation, under the Indemnification Agreement, the Company's certificate of incorporation and bylaws, the Company's D&O insurance and otherwise) and any claims to enforce such rights, (iii) vested rights or benefits under the Company's 401(k) or other benefit plans, (iv) claims to enforce the Lock-Up Agreement, or (v) rights under or claims to enforce this Agreement.  This Agreement will not prevent the Executive from filing, cooperating with, or participating in any proceeding before the Equal Employment Opportunity Commission or Department of Labor.

8.    <u>Release by the Company</u>.  The Company, on its own behalf and on behalf of its divisions, subsidiaries, parents, or affiliated corporations, past and present, and each of them, as well as each of its and their assignees, predecessors, successors, directors, officers, stockholders, partners, representatives, insurers, attorneys, agents or employees, past or present, or any of them (individually and collectively), hereby releases the Executive from and with respect to any and all claims, agreements, obligations, demands and causes of action, known or unknown, suspected or unsuspected, arising out of or in any way connected with events, acts, conduct, or omissions occurring at any time prior to and including the date Company signs this Agreement; provided, however, that such release shall not include claims for fraud, securities laws violations, criminal acts or rights under or to enforce this Agreement, the Restrictive Covenants Agreement and the Lock-Up Agreement or any act for which the Executive is not entitled to indemnification from the Company.

9.    <u>Representations, Warranties and Covenants</u>.

(a)    <u>Claims</u>.  The Executive represents, warrants and covenants to each of the Releasees that the Executive has not filed any claim, suit or action against the Company Group or any Releasee.  The Executive will not encourage any Person to institute any Claim against the Releasees or cooperate with any Person with any Claim.

(b)    <u>Company Property</u>.  The Executive agrees to promptly return all property of the Company within the Executive's possession, accessibility or control; *provided however*, that the Executive may retain his personal data and information including such information and data on any Company-issued cell phone and tablet.

10.    <u>Company Equity Awards</u>.  The Company hereby agrees to grant time-vested restricted stock units vesting on June 3, 2023 with respect to 1,069,000 Company shares in the aggregate to the employees of the Company designated in writing on or before the Effective Date ("<u>Eligible Employee</u>") by the Executive, subject to the applicable Eligible Employee's continued employment through June 2, 2023, it being agreed that any restricted stock units that are forfeited by any such Eligible Employee shall be reallocated pro rata to the other Eligible Employees who remain employed on June 3, 2023.

11.    <u>Press Release; Communications</u>.  Promptly following the execution of this Agreement, the Company shall issue a press release and file a Form 8-K disclosing this Agreement and the subject matter hereof; provided, that the Company shall provide the Executive an opportunity to review and comment on such press release and Form 8-K and consider any such comments in good faith.

12.    <u>Access to Information To Defend Against Lawsuits and Investigations</u>.  Within 14 days of the Effective Date, the Company shall provide the Executive with a copy of all emails the Executive sent or received through his Company email account, as well as the forensic images the Company took of the Executive's electronic devices.  To the extent that the Company and the Executive have a common interest, the Executive may make requests for additional documents necessary to the Executive's defense of any lawsuits and investigations and the Company will determine in its discretion whether to provide such additional documents (provided that the Company will not deny any such request unreasonably).

13.     <u>Standstill</u>.  During the period commencing with the Effective Date and ending on the third anniversary of the Effective Date (the "<u>Standstill Period</u>"), the Executive will not, and will cause each of his Affiliates and Associates not to, directly or indirectly, in any manner, alone or in concert with others (in each case, except as approved by a resolution of the Board):

(a)     acquire ownership (beneficial or otherwise) of more than 19 million shares of Common Stock (together with his Affiliates and Associates, in the aggregate during the Standstill Period) or rights or options to acquire such ownership;

(b)     propose or effect any tender or exchange offer, merger, consolidation, business combination, recapitalization, restructuring, liquidation or other extraordinary transaction with respect to the Company or its subsidiaries;

(c)     (i) make or participate in any "solicitation" (as defined under the Exchange Act) of proxies or consents with respect to the election or removal of directors or any other proposal (including any "withhold," "vote no" or similar campaign even if conducted as an exempt solicitation); (ii) seek or knowingly encourage election to or representation on the Board, or nominate or recommend the nomination of any candidate to the Board, or the removal of any member of the Board; or (iii) make any stockholder proposal;

(d)     publicly disclose (whether via social media platform or otherwise) any intention, plan or arrangement inconsistent with the foregoing; or

(e)     knowingly encourage or assist any other Person in undertaking any of the foregoing.

In addition, during the Standstill Period, the Executive agrees that he will, and will cause each of his Affiliates and Associates to, appear in person or by proxy at each meeting of the Company's stockholders and vote all Voting Securities beneficially owned by the Executive or such Affiliate or Associate (or which the Executive or such Affiliate or Associate has the right or ability to vote) at such meeting (a) in favor of the slate of directors recommended by the Board and (b) against the election of any nominee for director not recommended and nominated by the Board for election at such meeting.

14.     <u>Transfers</u>.  The Executive and the Company acknowledge that each remains subject to the terms and conditions of the Lock-Up Agreement.

15.     <u>Definitions</u>.

(a)     "<u>Affiliate</u>" means, with respect to a Person, any Person that, at the time of determination, directly or indirectly, through one or more intermediaries, controls, is controlled by or is under common control with, such first Person.  For purposes of this definition, "control" and, with correlative meanings, the terms "controlled by" and "under common control with," mean the possession, directly or indirectly, of the power to direct the management or policies of a Person, whether through the ownership of voting securities, by contract relating to voting rights or corporate governance, or otherwise.

(b)    "Associate" means, with respect to a Person who is an individual, (a) any of such Person's Family Members; (b) any company, partnership or trust in which such Person or any of such Person's Family Members owns five percent (5%) or more of its equity or voting interests; or (c) any trust for the benefit of such Person or one or more of such Person's Family Members.

(c)    "Common Stock" means the common stock, $0.0001 par value per share, of the Company.

(d)    "Family Member" means, with respect to a Person, such Person's spouse, parents, siblings, children and other descendants.

(e)    "Lock-Up Agreement" means that certain Registration Rights and Lock-Up Agreement dated as of June 3, 2020, by and among the Company and certain stockholders of the Company, as amended by Amendment No. 1 to Registration Rights and Lock-Up Agreement dated as of July 17, 2020.

(f)    "Person" means an individual, partnership, joint venture, limited liability company, corporation, firm, trust, unincorporated organization and government or other department or agency thereof.

(g)    "Voting Securities" means the Common Stock and any other securities of the Company entitled to vote in the election of directors.

16.    Section 409A.  It is intended that the provisions of this Agreement will comply with, or be exempt from, Section 409A of the Internal Revenue Code of 1986, as amended and any regulations and guidelines promulgated thereunder, and the Agreement shall be interpreted on a basis consistent with such intent.

17.    Complete Agreement; Inconsistencies.  This Agreement and any other documents referenced herein, constitute the complete and entire agreement and understanding of the Parties with respect to the subject matter hereof, and supersede in their entirety any and all prior understandings, commitments, obligations and/or agreements, whether written or oral, with respect thereto; it being understood and agreed that this Agreement and including the mutual covenants, agreements, acknowledgments and affirmations contained herein, is intended to constitute a complete settlement and resolution of all matters set forth in Section 7 hereof.

18.    Notices.  For purposes of this Agreement, except as expressly provided otherwise, notices and all other communications provided for herein will be in writing and will be deemed to have been duly given (a) when received if delivered personally or by courier, or (b) on the date receipt is acknowledged if delivered by certified mail, postage prepaid, return receipt requested, as follows:

If to the Company, addressed to:

Nikola Corporation
4141 E Broadway Road
Phoenix, AZ 85040

Attention: Chief Legal Officer

If to the Executive, addressed to the last known residential address reflected in the Company's records.

Notice may also be provided to such other address as either party may furnish to the other in writing in accordance herewith, except that notices or changes of address will be effective only upon receipt.

19.    Applicable Law; Submission to Jurisdiction.  This Agreement is entered into under, and will be governed for all purposes by, the laws of the State of Arizona, without regard to conflicts of laws principles thereof.  With respect to any claim or dispute related to or arising under this Agreement, the Parties hereby consent to the exclusive jurisdiction, forum and venue of the state and federal courts located in the State of Arizona.

20.    Arbitration.  Except as prohibited by law, the Parties agree that any dispute as to the meaning, effect, performance or validity of this Agreement or arising out of, related to, or in any way connected with, this Agreement or any relationship between the Executive and the Company (or between the Executive and any officer, director, employee or affiliates of the Company, each of whom is hereby designated a third party beneficiary of this Agreement regarding arbitration) will be resolved through binding arbitration in Maricopa County, Arizona under the rules of the American Arbitration Association and the Arbitration Rules set forth in Arizona Rules of Civil Procedure. Nothing in this arbitration provision is intended to limit any right the Executive may have to file a charge with or obtain relief from the National Labor Relations Board or any other state or federal agency. The Executive agrees that such arbitration will be conducted on an individual basis only, not a class, collective or representative basis, and hereby waive any right to bring class-wide, collective or representative claims before any arbitrator or in any forum.  THE PARTIES UNDERSTAND THAT BY AGREEING TO ARBITRATE DISPUTES THEY ARE WAIVING ANY RIGHT THEY MIGHT OTHERWISE HAVE TO A JURY TRIAL.  This arbitration provision is not intended to modify or limit substantive rights or the remedies available to the parties, including the right to seek interim relief, such as injunction or attachment, through judicial process, which will not be deemed a waiver of the right to demand and obtain arbitration.

21.    Severability.  Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be invalid, illegal or unenforceable in any respect under any applicable law or rule in any jurisdiction, such invalidity, illegality or unenforceability will not affect any other provision or any other jurisdiction, but this Agreement will be reformed, construed and enforced in such jurisdiction as if such invalid, illegal or unenforceable provision had never been contained herein.

22.    Successors and Assigns.  The Parties' obligations hereunder will be binding upon their successors and assigns.  The Parties' rights and the rights of the other Releasees will inure to the benefit of, and be enforceable by, any of the Parties' and Releasees' respective successors and assigns.  The Company may assign all rights and obligations of this Agreement to any successor

in interest to the assets of the Company.  The Executive may not assign any rights and obligations of this Agreement without the prior written consent of the Company.

      23.    <u>Amendments and Waivers</u>.  No amendment to or waiver of this Agreement or any of its terms will be binding upon any Party unless consented to in writing by such Party.

*[Remainder of Page Intentionally Blank]*

IN WITNESS WHEREOF, the Parties have executed this Relinquishment and Release Agreement, effective on the date as provided herein.

**NIKOLA CORPORATION**

By: _Mark Russell_ (DocuSigned by: AB87C9848EFF420...)

Name:    Mark A. Russell

Title:    Chief Executive Officer

**TREVOR MILTON**

_Trevor Milton_ (DocuSigned by: 64381D96442E4DA...)

*[Signature Page]*