1    **WO**

2

3

4

5

6    **IN THE UNITED STATES DISTRICT COURT**

7    **FOR THE DISTRICT OF ARIZONA**

8

9    Nikola Corporation,                     No. CV-24-00563-PHX-SHD

10                   Plaintiff,              **ORDER**

11   v.

12   Trevor R Milton, et al.,

13                   Defendants.

14

15          Pending before the Court are Defendant Trevor Milton's[1] motion to dismiss Plaintiff

16   Nikola Corporation's ("Nikola") amended complaint for failure to state a claim, (Doc. 50),

17   and Defendant Chelsey Milton's motion to dismiss the amended complaint for lack of

18   personal jurisdiction, (Doc. 68). For the reasons explained below, both motions are **denied**.

19   **I.    FACTUAL BACKGROUND**

20          Nikola is a corporation that "manufactures heavy-duty semi-trucks that run on

21   alternative fuels, such as battery-electric vehicles and fuel-cell electric vehicles." (Doc. 65

22   ¶ 5.) Trevor is Nikola's founder, is "one of its largest individual shareholders," was

23   Nikola's Chief Executive Officer ("CEO") until June 2020, and was its Executive

24   Chairman until September 2020, when he resigned. (*Id.* ¶ 6.)

25          In July 2021, "days before [Trevor's] federal indictment . . . was unsealed," he

26   "transferred approximately 1,750,000 shares of Nikola stock (with a total approximate

27   value of nearly $24.5 million) to his spouse for $0." (*Id.* ¶ 13.)

28   _____

[1]    The Court will refer to Trevor and Chelsey (collectively, the "Miltons") by their
first names to avoid confusion, not out of any disrespect.

In November 2021, Nikola brought an arbitration action against Trevor, alleging he breached his "duties of loyalty and good faith, by intentionally and knowingly spreading mistruths, and reaping enormous personal profits from his wrongdoing," which Nikola alleges resulted in "a whistleblower reporting [Trevor's] misconduct to the SEC" and "a deluge of subpoenas, regulatory investigations, and civil actions that caused Nikola massive harm and damages." (*Id.* ¶ 11.)

"Within just over two weeks of being served with the [arbitration] Demand," Trevor sold "approximately 15 million shares [of Nikola stock] worth about $164 million over an 11-day period." (*Id.* ¶ 12.) Between August and November 2021, Trevor "sold or gave away more than $317 million worth of Nikola stock that he beneficially owned directly through a company [he] wholly owned and controlled," M&M Residual LLC ("M&M"). (*Id.*)

In December 2021, Nikola moved for "emergency relief" in the arbitration proceeding, seeking "a temporary restraining order and a preliminary injunction to maintain the status quo and prevent [Trevor] from further selling or otherwise transferring his shares of Nikola stock until the conclusion of the Arbitration." (*Id.* ¶ 14.) The parties ultimately agreed that Trevor "would not sell any Nikola stock, directly or indirectly, during the pendency of the Arbitration absent at least seven (7) days' notice." (*Id.* (emphasis omitted).)

In November 2023, the arbitration panel issued an award "finding that [Trevor] violated his fiduciary duties of loyalty and good faith to Nikola, and finding [him] liable for damages in excess of $165 million (plus pre-judgment interest)." (*Id.* ¶ 15.) About one month later, Nikola initiated a separate action in this Court to confirm the award and enter judgment. (*Id.* ¶ 16; *Nikola Corp. v. Milton*, Case No. 23-cv-02635-PHX-DJH, Doc. 1 (D. Ariz. Dec. 18, 2023).) The Court ultimately amended the judgment against Trevor in November 2024, (*Nikola Corp. v. Milton*, Case No. 23-cv-02635-PHX-DJH, Doc. 49 (D. Ariz. Nov. 4, 2024)), and this judgment is currently on appeal before the Ninth Circuit, (*see generally Nikola Corp. v. Milton*, Case No. 24-6210, Doc. 30 (9th Cir. Apr. 3, 2025)).

1  Nikola alleges that Trevor is also subject to other proceedings that could "result in

2  significant monetary judgments against" him.  (Doc. 65 ¶ 18.)[2]

3  Nikola also alleges that, between when it brought the action to confirm the

4  arbitration award and when it brought the instant action, Trevor, through M&M,

5  "sold/transferred 46,923,834 shares of Nikola stock worth approximately $32 million."

6  (*Id.* ¶ 20.)  Nikola further asserts that since Nikola filed a Temporary Restraining Order on

7  March 19, 2024 "to restrain such sales," Trevor "siphon[ed] off an additional four million

8  shares," totaling "nearly 51 million shares of Nikola stock with a market value of

9  approximately $35 million."  (*Id.*)  As of March 26, 2024, M&M held "approximately

10 86,000 shares of Nikola stock—a mere 0.2% of the shares held before the Transfers."[3]  (*Id.*)

11 Nikola alleges these shares were ultimately transferred without consideration to a "Utah

12 LLC in which [Trevor's] own father is both the registered agent and the owner of the

13 property at the address listed for that company."  (*Id.* ¶ 22 (emphasis omitted).)

14 Nikola concludes Trevor is taking such actions to "delay, hinder, and defraud Nikola

15 from recovering the Arbitration Award entered in favor of Nikola."  (*Id.* ¶ 24.)  It cites

16 Trevor's January 26, 2024 notice to Nikola on behalf of M&M that he intended to

17 "nominate five individuals for election to Nikola's Board of Directors at Nikola's 2024

18 annual meeting of stockholders," identifying himself as the 51-million-share stockholder

19 source of the nominations.  (*Id.* ¶ 25.)  Nikola contends Trevor "must have intended to

20 retain possession or control of the shares of Nikola included in the Transfers," because

21 after the Court ordered expedited discovery, Trevor withdrew his nomination notice.  (*Id.*

22 ¶¶ 26–27.)  Nikola thus asserts Trevor "arranged to make it seem like he had received full

23 consideration for the Transfers (when in truth he had not) and abandoned his effort to wage

24 a proxy contest through the shares that he had transferred to an affiliated company for

25

26 [2]  Nikola cited Trevor's sentence for convictions of securities and wire fraud.  Trevor
   has since been pardoned.  Off. of the Pardon Att'y, Dep't of Just., *Executive Grant of*
27 *Clemency* (Mar. 27, 2025), *available at* https://www.justice.gov/pardon/media/1395001/
   [https://perma.cc/6KD9-JU34].

28 [3]  The Transfers are defined as Trevor's sale or transfer of "nearly 51 million shares
   of Nikola stock, with a market value of approximately $35 million."  (Doc. 65 ¶ 2.)

which his father is the registered agent." (*Id.* ¶ 27.)

## II.    PROCEDURAL HISTORY

On March 15, 2024, Nikola filed its Complaint. (Doc. 1.) Several days later, Nikola filed under seal a motion for a temporary restraining order. (Docs. 5, 8, 12.) The Court later, upon Nikola's motion, granted Nikola's request for alternative service on the Miltons. (Doc. 13.)

On March 26, 2024, the Court held a hearing concerning Nikola's request for a temporary restraining order, ultimately taking the matter under advisement. (Doc. 26.) The next day, the Court denied Nikola's request, holding Nikola had not shown a likelihood of success on the merits. (Doc. 29 at 6–9.) The Court granted Nikola's request for expedited discovery, however, and permitted Nikola to discover information about whether Trevor made fraudulent asset transfers to prevent Nikola from collecting on its arbitration award. (*Id.* at 9–10.)

While the parties engaged in discovery and related disputes, (*see* Docs. 31–35, 37, 39–43), Nikola filed the operative Amended Complaint ("FAC"), (Doc. 65).[4] The sole claim in the FAC is for fraudulent transfer in violation of the Arizona Uniform Fraudulent Transfer Act ("AUFTA"), Ariz. Rev. Stat. § 44-1004. (Doc. 65 ¶¶ 28–37.) Nikola requests a permanent injunction prohibiting "further disposition" of assets, an order setting aside any fraudulent transfers "to the extent necessary to satisfy all amounts that [Trevor] owes to Nikola pursuant to the Arbitration Award," orders of attachment and garnishment, a levy of execution, and attorneys' fees and costs. (*Id.* at 13–14.)

On May 14, 2024, Trevor filed the instant motion to dismiss the FAC for failure to state a claim. (Doc. 50.)[5] On May 28, 2024, Nikola filed a response. (Docs. 56, 66.)[6] On June 4, 2024, Trevor filed a reply. (Doc. 59.)

---

[4]    Nikola initially lodged the FAC under seal, (Doc. 44), but the Court ordered the FAC be publicly filed. (Doc. 62.)

[5]    Trevor submitted the motion solely on his behalf because, at the time, Chelsey had not yet been served. (Doc. 50 at 1 n.1.)

[6]    Nikola initially lodged its response under seal, (Doc. 56), but the Court ordered that the response be publicly filed, except for Exhibit B, (Doc. 56-1). (Doc. 62.) For simplicity, the Court will refer to the publicly filed version of the response, (Doc. 66).

On July 12, 2024, Chelsey filed her motion to dismiss the FAC for lack of personal jurisdiction. (Doc. 68.) On August 12, 2024, Nikola filed a response. (Doc. 69.) On August 22, 2024, Chelsey filed a reply. (Doc. 70.)

On July 31, 2025, the Court issued a tentative order. (Doc. 83.)

On August 20, 2025, the Court heard oral argument. (Doc. 84.)

## III.    TREVOR'S MOTION TO DISMISS

Trevor moves to dismiss Nikola's claim for fraudulent transfer under the AUFTA based on three primary arguments: (1) the AUFTA only applies to transfers made by the debtor and thus does not apply to the subject transfers because M&M made the transfers, not Trevor, (Doc. 50 at 4, 6–7); (2) even if the AUFTA applies, Nikola has not sufficiently pled that the transfers were fraudulent; (*id.* at 7–8, 11–15); and (3) that he could not have violated the AUFTA because "there has been no depletion or concealment of assets," (*id.* at 2, 8–11). The Court addresses each argument in turn.

### A.    Legal Standard

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true" and construed in a light most favorable to the plaintiff, "to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation marks omitted). A claim is plausible if the plaintiff pleads "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* In making this determination, the Court does not accept legal conclusions as true, nor does the Court consider "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Id.*; *see also id.* ("Nor does a complaint suffice if it tenders naked assertion[s] devoid of further factual enhancement." (alteration in original) (quotation marks omitted)). That said, "a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need *detailed* factual allegations." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (emphasis added). A "well-pleaded complaint may proceed even if" actual proof of those facts "is improbable, and . . . a recovery is very remote and

1    unlikely." *Id.* at 556 (quotation marks omitted).

2         **B.    Discussion**

3         The AUFTA provides that a "transfer made . . . by a debtor is fraudulent as to a

4    creditor . . . if the debtor made the transfer" (1) "[w]ith actual intent to hinder, delay or

5    defraud any creditor of the debtor" or (2) "[w]ithout receiving a reasonably equivalent

6    value in exchange for the transfer" and the debtor "[w]as engaged or was about to engage

7    in a . . . transaction for which the remaining assets of the debtor were unreasonably small

8    in relation to the business or transaction."  Ariz. Rev. Stat. § 44-1004(A).  These two

9    categories of fraudulent transfers are "actually fraudulent transfers" (actual intent) and

10   "constructively fraudulent transfers" (lack of consideration).  *Hullett v. Cousin*, 63 P.3d

11   1029, 1032 (Ariz. 2003).  The statute defines "debtor" as "a person who is liable on a

12   claim," and "value" means "exchange for the transfer . . . [if] property is transferred or an

13   antecedent debt is secured or satisfied."  Ariz. Rev. Stat. §§ 44-1001, 44-1003(A).  Where

14   Arizona courts have not addressed issues pertaining to interpretation of the AUFTA, the

15   Court may properly consider "cases from other jurisdictions having similar statutes."

16   *Hullett*, 63 P.3d at 1033.

17        **1.    Application of the AUFTA**

18        Trevor argues that the AUFTA is not implicated because the statute "is only

19   available with respect to transfers made by a debtor against whom a creditor has a claim,"

20   and because M&M made the transfers, Trevor (the debtor) cannot be liable.  (Doc. 50 at

21   4–5.)  Trevor notes that "M&M is not a party to this action and is not alleged to have any

22   liability or payment obligations under the Arbitration Award."  (*Id.* at 5.)  Trevor argues it

23   does not matter that Nikola "appears to assert that [he] controlled, or was acting through,

24   M&M" under the plain language of the statute, because Nikola did not allege sufficient

25   facts to pierce the corporate veil. (*Id.* at 6.)  At oral argument, however, Trevor conceded

26   he manages M&M and, indeed, the Court concluded as much previously.  (*See* Doc. 29 at

27   7–8 n.6 ("[T]he record shows that [Trevor] is the sole managing officer of M&M and [he]

28   uses M&M for the purpose of controlling Nikola Stock." (citation omitted)).)

The parties do not cite any decision by Arizona state courts squarely addressing this issue, nor has the Court found any in its independent research. But the definition of "transfer" under the AUFTA is broad: "Under the [AUFTA], a transfer is 'every mode, direct *or indirect*, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or *an interest in an asset* and includes payment of money, *release*, lease and creation of a lien or other encumbrance,'" which is a "broad statutory definition [that] clearly includes any transaction in which a property interest was relinquished." *Kaufmann v. M & S Unlimited, L.L.C.*, 121 P.3d 181, 184 (Ariz. App. 2005) (first emphasis added) (citation omitted) (quoting Ariz. Rev. Stat. § 44-1001(9)). Assuming the truth of Nikola's allegations that Trevor "wholly own[s] and control[s]" M&M, (Doc. 65 ¶¶ 12, 25 (alleging Trevor was "identified as the <u>only</u> 'beneficial owner of'" M&M in a Notice of Intent sent to Nikola by M&M); *see also* Doc. 29 at 7–8 n.6), the AUFTA is broad enough to capture a transfer made indirectly by a debtor, through an entity over which he has control or which holds assets for his benefit, *see Armed Forces Bank NA v. Dragoo*, 2018 WL 8621584, at *2–3 (D. Ariz. 2018) (holding that a plaintiff stated a AUFTA claim where the defendants indirectly transferred an asset through "effective[] control [over] the payment of funds by" an entity).

Under similar circumstances, the Ninth Circuit held that an indirect transfer made by a person through control over a non-debtor entity was encompassed within the Washington Uniform Fraudulent Transfer Act ("WUFTA"), which contained a definition of "transfer" almost identical to that in the AUFTA. *DZ Bank AG Deutsche Zentral-Genossenschaft Bank v. Meyer*, 869 F.3d 839, 842–44 (9th Cir. 2017). In *Meyer*, the lower court held that a creditor "could only recover assets that were the property of [the] debtor[s]—i.e., legally titled in the [debtors'] name," and because the assets the creditor sought to collect from were "legally titled in [a non-debtor entity's] name, WUFTA did not apply" unless the creditor "obtain[ed] a ruling that [the non-debtor entity] was the alter ego of the [debtors]." *Id.* at 842 (first two alterations in original) (citation and quotation marks omitted). The Ninth Circuit disagreed, noting that the WUFTA was intended to "provide

1   relief for creditors whose collection on a debt is frustrated by the actions of a debtor to

2   place the putatively satisfying assets beyond the reach of the creditor." *Id.* (citation

3   omitted).  The court reasoned that, if the non-debtor entity had retained the assets, the

4   creditor "would have been able to enforce any judgment against the [debtors] . . . by

5   executing against [one of the debtor's] 100% ownership interest in [the non-debtor entity]

6   to satisfy [part] of its claim." *Id.* at 843.  However, when one of the debtors "indirectly

7   transferred all of [the non-debtor entity's] assets to another corporation, he . . . depleted the

8   value of his assets to the detriment of his creditors" and ultimately "prevented [the creditor]

9   from collecting [part] of the debt he owed." *Id.*

10          At oral argument, Trevor did not meaningfully argue *Meyer* was distinguishable,

11   and its holding is instructive.  Applying *Meyer*'s reasoning to the circumstances here,

12   Trevor's argument that the AUFTA does not apply must fail because, taking the allegations

13   in the FAC as true, *Trevor* indirectly transferred assets to another entity. *Id.* at 842.  It is

14   therefore not necessary for the Court to find that M&M is an alter ego of Trevor.  *See id.*

15   Further, considering authority from other jurisdictions with similar statutes to the AUFTA,

16   *Hullett*, 63 P.3d at 1033, other courts have permitted UFTA claims to proceed against

17   debtors who "indirectly" transferred assets, including through control over non-debtor

18   entities, *see Reilly v. Antonello*, 852 N.W.2d 694, 699–701 (Minn. Ct. App. 2014)

19   (rejecting argument that transfers made by a non-debtor corporation were not covered by

20   the Minnesota UFTA because the statute "is intended to apply to indirect transfers through

21   a closely held corporation when the transfers are facilitated by a sole shareholder, officer,

22   and director of the corporation," and allowing such a debtor to "mask his fraudulent actions

23   behind the façade of a closely held corporation would defy the plain meaning and intent of

24   the [UFTA]"); *see also Meyer*, 869 F.3d at 843 (citing *Reilly* with approval and collecting

25   cases); *cf. Geriatrics, Inc. v. McGee*, 208 A.3d 1197, 1207 (Conn. 2019) ("There is no

26   provision in [the Connecticut UFTA] that explicitly or even implicitly provides that acts of

27   the debtor's agent shall not be imputed to the debtor.").  These and other courts endorse a

28   broad interpretation of the UFTA, in part because the purpose of the UFTA is intended to

protect property from being removed from the reach of creditors. *Meyer*, 869 F.3d at 842–43; *Geriatrics*, 208 A.3d at 1206 ("As the statute was enacted for the suppression of fraud, the advancement of justice and the promotion of the public good, it should be liberally and beneficially construed to suppress the fraud, abridge the mischief and enlarge the remedy." (citation omitted)); *Reilly*, 852 N.W.2d at 699; *McCain Foods USA, Inc. v. Cent. Processors, Inc.*, 61 P.3d 68, 78–79 (Kan. 2002) ("Due to the broad scope of UFTA, the legislature did not intend that an insider escape liability through a circuitous arrangement to avoid liability under UFTA.").

Trevor's cited cases do not compel a different result. (Doc. 50 at 4–5.) In *Crystallex International Corp. v. Petroleos De Venezuela, S.A.*, 879 F.3d 79 (3d Cir. 2018), the Third Circuit did not interpret Delaware's UFTA in the first instance. Unlike here, Delaware courts had already interpreted the statute to exclude fraudulent transfers committed by non-debtors unless the corporate veil was pierced, and the creditor in that case had not alleged that the relevant transferor was the alter ego of other entities. *See* 879 F.3d at 85–86. As noted above, the Ninth Circuit has not taken this approach. *Meyer*, 869 F.3d at 842.

Likewise, *Moh Management, LLC v. Michelangelo Leasing, Inc.* is an unpublished decision from the Nevada Supreme Court holding that a debtor was not liable for a transfer made by his trustee. 437 P.3d 1054, 2019 WL 1437136, at *2 (Nev. 2019). Importantly, the debtor was "required" to transfer his assets to a trustee under "California's assignment for the benefit of creditors law," and the *trustee* then transferred assets to a transferee to satisfy the debtor's debt to the transferee. *See generally id.* at *1–3. This process was an "alternative to a bankruptcy proceeding." *Id.* at *1. There do not appear to have been any allegations that the debtor was directing or causing the trustee's actions, and the "entire purpose" of the transfer was to satisfy the debtor's debts. *See generally id.* at *1–3.

At oral argument, Trevor cited the Arizona Supreme Court decision in *Dietel v. Day*, 492 P.2d 455 (Ariz. Ct. App. 1972), but this decision does not help him. In *Dietel*, the Arizona Court of Appeals decided whether the corporate veil could be pierced to hold the defendant, a "shareholder, director and subsequently, . . . president" of a corporation,

personally liable.  *See id.* at 457.  As discussed above, it is unnecessary to address the corporate veil issue given the conclusion that the AUFTA encompasses transfers made indirectly by Trevor through an entity he controls.  Moreover, *Dietel* stated that the corporate veil could be pierced if there was a "showing that observance of the corporate form would sanction a fraud," which was not present in *Dietel* because it concerned a breach of contract claim.  *See id.* at 457–58 (quoting *Ferrarell v. Robinson*, 465 P.2d 610, 613 (Ariz. Ct. App. 1970)); *see also id.* at 459 (holding corporate veil could not be pierced in part because there was no "evidence of fraud").  Assuming the truth of Nikola's allegations and applying the holding in *Dietel*, observing the corporate form of M&M would sanction fraudulent transfers because it would allow Trevor to remove assets from the reach of creditors simply by using an intermediary entity.  The *Dietel* decision thus does not support Trevor's argument because it aligns with the decisions above that have interpreted the UFTA broadly to reach indirect transfers made through entities.  *See Meyer*, 869 F.3d at 842–43; *Reilly*, 852 N.W.2d at 699–701; *McCain Foods*, 61 P.3d at 78–79.

Accordingly, to "conform[] with the long-established principle that courts will refuse to sanction acts done by indirection that if performed directly would be barred by law," the Court declines to dismiss Nikola's AUFTA claim on this ground.  *McCain Foods*, 61 P.3d at 80; *see also Geriatrics*, 208 A.3d at 1208 (noting that the term "transfer" could "hardly be defined more broadly").

### 2. Sufficiency of Allegations

Trevor next challenges the allegations supporting the AUFTA claim as insufficiently pled under Federal Rule of Civil Procedure 9(b), or under ordinary pleading standards if Rule 9(b) does not apply.  (Doc. 50 at 7–8; Doc. 59 at 8 n.9.)  He argues that Nikola's allegation that Trevor still has control over the transferred shares is "conjecture," that the "mere association of Mr. Milton's father with the third-party entity that purchased the transferred shares in exchange for market-rate consideration is not sufficient to give rise to an inference of fraud," and that the timing of the transfers "hardly suggests a sudden scramble to transfer assets with the intent to hide or shield them."  (*Id.* at 12–14.)

Nikola responds that it alleged numerous badges of fraud under the AUFTA, including that (1) Trevor made the transfers to an insider, (2) Trevor retained possession or control of the stock after the transfers, (3) Trevor "rapidly removed and concealed" the transfers, (4) the transfers occurred after Nikola sued Trevor, (5) Trevor did not receive reasonably equivalent value for the transfers, and (6) the transfers occurred soon after the Arbitration Award was issued and Nikola took steps to confirm its award. (Doc. 66 at 12–15.) Nikola also argues it has alleged additional, non-statutory badges of fraud, concerning Trevor's "history of selling/transferring shares of Nikola stock when faced with potential debts and liabilities," Trevor's conduct in discovery, and the "unusual and unexplained nature of the Transfers." (*Id.* at 15–17.)

As an initial matter, neither the Ninth Circuit nor the Arizona Supreme Court has decided whether Rule 9(b) applies to the AUFTA claim, and other courts have reached differing conclusions regarding UFTA statutes. *Compare Castillo v. Johnson*, 2019 WL 4222289, at \*7 (D. Ariz. 2019) (rejecting argument that Rule 9(b) applies to AUFTA claims and collecting cases), *with In re Tribune Co. Fraudulent Conv. Litig.*, 10 F.4th 147, 159 (2d Cir. 2021) (applying Rule 9(b) to fraudulent conveyance claim under the Bankruptcy Code), *with Foisie v. Worcester Polytechnic Ins.*, 967 F.3d 27, 49–50 (1st Cir. 2020) (noting that Rule 9(b)'s application to fraudulent conveyance claims under the UFTA "is a matter of some uncertainty" and collecting cases), *and with Matter of Life Partners Holdings, Inc.*, 926 F.3d 103, 117–18 (5th Cir. 2019) (declining to "weigh in on this vexing question" and noting the split in authority). The parties do not address this issue in significant depth. (*See* Doc. 50 at 7–8; Doc. 66 at 7 n.9.) For purposes of this motion, the Court assumes, without deciding, that Rule 9(b) applies to the claim, but finds that Nikola's allegations sufficiently meet this standard for the reasons explained below. *See Airbus DS Optronics GmbH v. Nivisys LLC*, 2017 WL 1197105, at \*8 (D. Ariz. 2017) (holding allegations were "sufficiently particular to support an allegation of actual fraud" where the allegations "outline[d] generally several of the indicators of fraudulent intent enumerated by § 44-1004(B)").

The AUFTA "identifies eleven specific factors that may be considered (among other factors) in determining 'actual intent.'" *Carey v. Soucy*, 431 P.3d 1200, 1205 (Ariz. Ct. App. 2018). "[T]he statutory factors have a tendency to show the existence of fraud and often only a single one of them may establish and stamp a transaction as fraudulent." *Id.* at 1206 (quotation marks omitted). Additionally, the "common law recognizes additional 'badges of fraud'"—"facts which throw suspicion on a transaction, and which call for an explanation"—including the "chronology of events." *Id.* (quotation marks omitted).

Nikola has sufficiently pled allegations constituting badges of fraud under the AUFTA. First, Nikola alleged that Trevor transferred the stock to an insider, *see* Ariz. Rev. Stat. § 44-1004(B)(1)—here, an entity for which Trevor's father is the "registered agent and the owner of the property at the address listed for that company." (Doc. 65 ¶ 22.) Although Trevor argues that his father's "mere association" with the entity that purchased the shares is insufficient, Trevor's father is more than "merely associated" with the entity to which Trevor transferred the shares—he is also one of at most two managers for the entity, according to Utah's business registration records.[7] This means Trevor's father has some level of control over the entity to which Trevor transferred the stock. *See* Utah Code § 48-3a-102(12) (defining a manager of an LLC as "a person that under the operating agreement of a manager-managed limited liability company is responsible, alone or in concert with others, for performing . . . management functions"). Construed in a light most favorable to Nikola, this suffices to survive a motion to dismiss. *Gerow v. Covill*, 960 P.2d 55, 57–58, 62–63 (Ariz. Ct. App. 1998) (affirming finding of fraudulent transfer where asset was transferred to a corporation incorporated by a family member and calling this transfer one made "to an insider"); *see also In re XYZ Options, Inc.*, 154 F.3d 1262, 1273–74 (11th Cir. 1998) (holding a reasonable factfinder could find that fraudulent transfers were made where the debtor, "in control of [an entity]," and other entities "artificially inflated the amount of [a] consent judgment" such that money would be "diverted to either

---

[7]    The Court may take judicial notice of "government documents and public records." *See, e.g.*, *Proline Distrib. Servs., Inc. v. Rhino Boss LLC*, 2020 WL 3031625, at *2 n.1 (C.D. Cal. 2020) (citation omitted).

a corporation owned by [the debtor's] mother or to persons or organizations benefitting [the debtor's] business interests").

Second, Nikola has alleged that Trevor retained control over the stock after the transfers, *see* Ariz. Rev. Stat. § 44-1004(B)(2), because Trevor did not withdraw his letter intending to nominate individuals to Nikola's Board of Directors until after the hearing on Nikola's TRO and court-ordered expedited discovery, (Doc. 65 ¶¶ 25–27).   Although Trevor is correct that he submitted the letter to Nikola before the subject transfers, (Doc. 50 at 12), the Court ultimately concludes that the allegations, viewed in a light most favorable to Nikola, are sufficient at this stage as a badge of fraud.   A reasonable factfinder could find that the many weeks that passed between when the transfer occurred and when Trevor withdrew his nomination letter, coupled with the close timing of the withdrawal to the Court's order of expedited discovery and the subsequent transfers to an entity controlled by his father, is circumstantial evidence of fraudulent intent.   *Bontrager v. Showmark Media LLC*, 2014 WL 12600201, at *3 (C.D. Cal. 2014) ("A court may resolve [a] question on a motion to dismiss . . . if [n]o reasonable trier of fact could conclude otherwise." (third alteration in original) (quotation marks omitted)); *State ex rel. Indus. Comm'n of Ariz. v. Wright*, 43 P.3d 203, 208 (Ariz. Ct. App. 2002) (stating that fraudulent intent "may be shown by direct proof or by *circumstantial evidence* from which actual intent may be reasonably inferred" (emphasis added) (quotation marks omitted)); *see also In re Devers*, 759 F.2d 751, 753–54 (9th Cir. 1985) ("[F]raudulent intent may be established by circumstantial evidence, or by inferences drawn from a course of conduct."); *In re Transact, Inc.*, 2014 WL 3888230, at *29 (C.D. Cal. 2014) ("A determination of fraudulent intent is usually based on circumstantial evidence that must be weighed by the trier of fact."); *In re Crater*, 286 B.R. 756, 764 n.11 (D. Ariz. 2002) ("[I]nsider sales may also facilitate a secret retention of possession, control or benefit.").

Third, Nikola has alleged that Trevor made some of the transfers after he was sued by Nikola. (Doc. 65 ¶ 12.) *See* Ariz. Rev. Stat. § 44-1004(B)(4). Although Trevor argues that the "first of the Transfers did not occur until . . . two years after Nikola filed its

Arbitration Demand," (Doc. 50 at 14), this is immaterial.  Under the AUFTA, a badge of fraud is present if, "[b]efore the transfer was made . . . , the debtor had been sued or threatened with suit."  Ariz. Rev. Stat. § 44-1004(B)(4).  The statute does not contain any temporal restriction between when the debtor was sued and the transfer occurred, and the statute's use of "shortly after" in a different badge of fraud suggests that the omission of a temporal limitation was intentional.  *See id.* § 44-1004(B)(9)–(10); *Ariz. Dep't of Revenue v. Gen. Motors Acceptance Corp.*, 937 P.2d 363, 367 (Ariz. Ct. App. 1996) ("Where the legislature has used a particular term in one place in a statute and has excluded it in another place in the same statute, a court should not read that term into the provision from which the legislature has chosen to omit it.").

Because "often only a single one of them may establish and stamp a transaction as fraudulent," *Carey*, 431 P.3d at 1206, these badges of fraud pled by Nikola—and assumed as true by the Court—are enough to survive Trevor's motion to dismiss, *see, e.g.*, *Gerow*, 960 P.2d at 63 (holding that transfer to "an insider, a family member" was a "badge[] of fraud"); *Premier Fin. Servs. v. Citibank (Ariz.)*, 912 P.2d 1309, 1315 (Ariz. Ct. App. 1995) (holding that debtors' changing the name on a certificate of deposit to their daughter's name "after a lawsuit was filed against them and while a motion for summary judgment was pending against them" presented "several badges of fraud" (quotation marks omitted)); *Pearce v. Stone*, 720 P.2d 542, 546 (Ariz. Ct. App. 1986) (holding conveyance bore badges of fraud where the debtors transferred property into a trust two months after receiving a "series of demand letters threatening . . . litigation" and the debtors "continued to exercise indicia of ownership by occupying the residence after it was placed in trust"); *see also KeyBank Nat'l Ass'n v. Neumann Dermatology LLC*, 2022 WL 16635372, at *7 (D. Ariz. 2022) (holding plaintiff met its burden of "actual intent" where (1) an LLC made transfers to the sole decisionmaker defendant; (2) the defendant "retained possession of the assets after the transfers, given that the assets were effectively in her possession prior to the transfer because [the LLC was] essentially an alter ego"; (3) "the transfers occurred after [the LLC] was threatened with suit"; and (4) "the transfers were of substantially all of [the

LLC's] assets").  The Court thus need not address the parties' arguments concerning the other alleged badges of fraud Nikola raised in its response.  (Doc. 66 at 14–17; Doc. 59 at 9–11.)  Because the allegations in the FAC are sufficient, the Court also does not address Trevor's argument that Nikola improperly cited materials outside the FAC in its response. (Doc. 59 at 4–5.)

Although Trevor argues there are reasonable explanations for the transfers and the circumstances surrounding them that would preclude a finding of actual intent, (*see* Doc. 50 at 12–15; Doc. 59 at 9–11), this also is immaterial, particularly at the motion to dismiss stage.  *Wang v. LM Gen. Ins. Co.*, 2023 WL 2913396, at *3 (D. Nev. 2023) ("The court does not assess the veracity of claims while adjudicating a motion to dismiss.  Instead, it considers whether [the plaintiff] has stated a claim to relief that is *plausible* on its face." (quotation marks omitted)); *North v. Rosenoff*, 2016 WL 7369867, at *4 (N.D. Cal. 2016) ("At the motion to dismiss stage, the Court will not weigh the evidence."); *Kaufmann*, 121 P.3d at 185 (stating that, under the AUFTA, "proof of intent does not appear to be required; instead, the plaintiff must merely prove the circumstances listed in the statute"); *cf. Eagle Eye Produce Inc. v. Agricola Faader SPR de RL*, 2019 WL 13162563, at *2 (D. Ariz. 2019) (denying motion for summary judgment on AUFTA claim where intent was contested and there was "competing evidence"); *Airbus*, 2017 WL 1197105, at *9 ("A finding of 'actual intent' as a matter of law is appropriate only if the evidence presents *no* genuine issue of fact."); *Merch. Transaction Sys., Inc. v. Necela, Inc.*, 2010 WL 382886, at *2–3 (D. Ariz. 2010) (holding claims were likely to succeed on the merits where transfers "evidence[d] numerous badges of fraud" even though the defendant "aver[red] they were perfectly innocent" and "offer[ed] non-fraudulent explanations as to" those badges because "[s]uch explanations . . . do not end the Court's inquiry" and would "render[] [the AUFTA] ineffective, as it is likely that nearly every person accused of fraudulent transfer would state a perfectly reasonable explanation for their action").

Finally, although the Court previously applied Rule 9 to hold that Nikola's "hunches" were not "sufficient evidence" to show a likelihood of success on the merits,

1    (Doc. 29 at 9), Nikola's burden to obtain a TRO is much higher than to survive a motion

2    to dismiss.  *See, e.g.*, *Freelancer Int'l Pty Ltd. v. Upwork Glob., Inc.*, 2021 WL 12331658,

3    at *1 (N.D. Cal. 2021) ("While defendants successfully opposed plaintiffs' preliminary

4    injunction . . . the standard on a motion to dismiss is a far lower bar."); *Varnell v. Wash.*

5    *Dep't of Corrs.*, 2016 WL 7157415, at *2 (W.D. Wash. 2016) ("Unlike a motion to dismiss,

6    it is Plaintiff's burden, as the moving party, to demonstrate he is entitled to the

7    extraordinary remedy of preliminary injunctive relief."), *report and recommendation*

8    *adopted*, 2017 WL 378571 (W.D. Wash. 2017).

9    **3.     Nikola's Ability to Recover**

10    Trevor next argues Nikola has not sufficiently pled a fraudulent transfer claim

11    because the stock was sold for fair market value in exchange for cash "under entirely

12    innocuous circumstances."  (Doc. 50 at 8.)  Because "the consideration received is located

13    in a bank account at Mountain America Credit Union—*i.e.*, far from being hidden from

14    Nikola," he argues, "there is no basis for Nikola to claim that the Transfers were

15    fraudulent."  (*Id.* at 9.)  Further, he argues there cannot have been any fraudulent transfer

16    because the "challenged transfers did not diminish or deplete [his] assets" and were instead

17    just "converted . . . into readily available cash."  (*Id.* at 9–10.)  Thus, he concludes, "there

18    has been no hindrance of Nikola's ability to recover on the Arbitration Award (if the award

19    is ultimately confirmed)."  (*Id.* at 11.)  Nikola responds that it does not need to allege the

20    inadequacy of consideration, and argues that "even if [Trevor] ultimately received the full,

21    market value of the Nikola stock transferred . . . the Transfers are still fraudulent . . . if [he]

22    made the Transfers with the requisite state of mind, which Nikola abundantly has alleged

23    he did."  (Doc. 66 at 11.)

24    Contrary to Trevor's argument, the AUFTA does not require that a debtor's assets

25    be depleted before a creditor can seek relief.  *See, e.g.*, *Kaufmann*, 121 P.3d at 184 ("It is

26    not the transaction itself, but rather[,] the purpose behind the transaction, that brings a

27    transaction under the scrutiny of [the AUFTA].").  Indeed, a transfer of "substantially all

28    of the debtor's assets" is only one of many factors that a court may consider in determining

whether a transfer was made with fraudulent intent.  Ariz. Rev. Stat. § 44-1004(B)(5).  Accordingly, this factor cannot be dispositive as to whether a fraudulent transfer occurred.

That the statute does not contain any such requirement is further evidence that the Arizona legislature did not intend to include one.  *See Est. of Dominguez v. Dominguez*, — P.3d —, 2025 WL 1119878, at *9 (Ariz. 2025) (Lopez, J., concurring) ("[T]he omitted-case canon, which provides that [an] absent provision cannot be supplied by the courts, ends our inquiry." (second alteration in original) (quotation marks omitted)); *In re Riggins*, 544 P.3d 64, 69 (Ariz. 2024) ("[A] matter not covered is to be treated as not covered." (quoting Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 93 (2012))).  The fact that this Court is sitting in diversity jurisdiction counsels against narrowing the reach of a state law to contain an unenumerated requirement.  *Doe 1 v. AOL LLC*, 552 F.3d 1077, 1085 (9th Cir. 2009) (per curiam) (Nelson, J., concurring) ("[A]s a federal court sitting in diversity jurisdiction, we apply, but do not create, state law."); *Wells v. McMahon*, 2019 WL 1779566, at *7 (D. Nev. 2019) ("When sitting in diversity jurisdiction, federal courts are bound to follow the law of the forum state and do not participate in the evolution of state law." (quotation marks omitted)).

Furthermore, under the AUFTA, a creditor may seek an injunction against "further disposition by the debtor or a transferee, or both, of the asset transferred *or of other property*."  Ariz. Rev. Stat. § 44-1007(4) (emphasis added).  Requiring creditors to wait until a debtor's assets are entirely depleted before seeking this relief under the AUFTA would render this remedy largely toothless and is therefore not a preferred interpretation of the statute.  *See Ariz. Free Enter. Club v. Hobbs*, 515 P.3d 664, 669 (Ariz. 2022) ("[Courts] also afford meaning to each word, phrase, and sentence . . . so that no part will be void, inert, redundant, or trivial." (second alteration in original) (quotation marks omitted)).

Trevor's suggestion that, if he received fair market value for the stock, he is insulated from liability under the AUFTA, is also unpersuasive.  Regardless of whether he received fair market value, a transfer may still be fraudulent if made "[w]ith actual intent

to hinder, delay or defraud any creditor."  Ariz. Rev. Stat. § 44-1004(A)(1); *Hullett*, 63 P.3d at 1032 (distinguishing between actually fraudulent transfers under Section 44-1004(A)(1) and constructively fraudulent transfers under Section 44-1004(A)(2)). Trevor's reliance on authority from other jurisdictions is misplaced because under Arizona law, "[w]hen a statute's plain language is unambiguous in context, it is dispositive."  *In re Drummond*, 543 P.3d 1022, 1025 (Ariz. 2024).  For the reasons explained, the AUFTA's plain language unambiguously encompasses transfers that were made with fraudulent intent, regardless of whether the assets were ultimately depleted or whether the debtor received sufficient value for the assets.  The statute is therefore dispositive, and the Court need not look at authority from other jurisdictions.

### 4.    Available Remedies

Finally, in a footnote, Trevor argues that Nikola is "not entitled to the equitable remedies sought in the Amended Complaint": a levy of execution, an order setting aside the transfers, an order of attachment, and an order of garnishment.  (Doc. 50 at 13–14 n.7.) Nikola does not address this argument in its response.  (*See generally* Doc. 66; Doc. 59 at 6 n.7.)  Putting a substantive argument in a footnote does not properly raise the issue for the Court's consideration.  *See, e.g.*, *McClure v. State Farm Life Ins. Co.*, 2022 WL 3099236, at *2 (D. Ariz. 2022) (stating that a "footnote is the wrong place for substantive arguments on the merits of a motion" and collecting cases).  Excessive use of substantive footnotes plagues the parties' briefing, (*see* Doc. 66 (28 footnotes over 17 pages); Doc. 59 (16 footnotes over 11 pages)), so the Court is disinclined to excuse it.  Even if Trevor had properly raised the issue, however, the Court would decline to address whether Nikola's requested relief is permissible under the AUFTA at this stage.  *See, e.g.*, *Doe v. Arizona*, 2016 WL 1089743, at *5 (D. Ariz. 2016) ("A request for relief cannot be dismissed for failure to state a claim.").

Accordingly, for the reasons explained, the Court denies Trevor's motion to dismiss.

1    **IV.    CHELSEY'S MOTION TO DISMISS**

2        **A.    Personal Jurisdiction**

3           Chelsey moves for dismissal based on lack of personal jurisdiction, arguing that the

4    only allegations made against her specifically relate to her status in the marital community

5    and do not establish that she "engaged in any activity or directed any activity towards

6    Arizona." (Doc. 68 at 3.) Nikola asserts that it joined Chelsey to "afford [her] the benefit

7    of certain protections conferred by Arizona law" under A.R.S. § 25-215(D) because it

8    argues that the Miltons lived in Arizona previously and acquired the Nikola stock at issue

9    in this case "while married and domiciled in Arizona." (Doc. 69 at 1, 5 (citing Amburgy

10   Declaration, (Doc. 69-1)).) Nikola further argues that personal jurisdiction exists over her

11   because the "community property specifically at issue in [this] civil action may be subject

12   to Arizona law," so "personal jurisdiction can be established over a spouse by virtue of her

13   membership in the marital community." (Doc. 69 at 1.)

14       **1.    Legal Standard**

15          "In opposing a defendant's motion to dismiss for lack of personal jurisdiction, the

16   plaintiff bears the burden of establishing that jurisdiction is proper." *Ranza v. Nike, Inc.*,

17   793 F.3d 1059, 1068 (9th Cir. 2015) (quotation marks omitted). "[M]ere 'bare bones'

18   assertions of minimum contacts with the forum or legal conclusions unsupported by

19   specific factual allegations will not satisfy a plaintiff's pleading burden." *Swartz v. KPMG*

20   *LLP*, 476 F.3d 756, 766 (9th Cir. 2007). However, "the plaintiff need only make a prima

21   facie showing of jurisdictional facts to withstand the motion to dismiss." *Ranza*, 793 F.3d

22   at 1068 (citation omitted).

23          In determining whether personal jurisdiction exists, a court may consider affidavits

24   or written materials. *See Data Disc, Inc. v. Sys. Tech. Assocs., Inc.*, 557 F.2d 1280, 1285

25   (9th Cir. 1977). If written materials are considered, a plaintiff is not required to prove

26   jurisdictional facts by a preponderance of the evidence at this stage, because then a

27   "defendant [could] obtain a dismissal simply by controverting the facts established by a

28   plaintiff through his own affidavits and supporting materials." *See id.* Indeed, "if both

1  sides submit affidavits, then conflicts between the parties over statements contained in

2  affidavits must be resolved in the plaintiff's favor."  *LNS Enters. LLC v. Cont'l Motors,*

3  *Inc.*, 22 F.4th 852, 858 (9th Cir. 2022) (citation modified).  Additionally, the documents

4  submitted by the plaintiff in support of jurisdiction "are construed in the light most

5  favorable to the plaintiff."  *Metro. Life Ins. Co. v. Neaves*, 912 F.2d 1062, 1064 n.1 (9th

6  Cir. 1990).  Ultimately, "if a plaintiff's proof is limited to written materials, it is necessary

7  only for these materials to demonstrate facts which support a finding of jurisdiction in order

8  to avoid a motion to dismiss."  *Data Disc*, 557 F.2d at 1285.

9  "Federal courts ordinarily follow state law in determining the bounds of their

10  jurisdiction over persons."  *Morrill v. Scott Fin. Corp.*, 873 F.3d 1136, 1141 (9th Cir. 2017)

11  (quoting *Daimler AG v. Bauman*, 571 U.S. 117, 125 (2014)).  "Arizona law permits the

12  exercise of personal jurisdiction to the extent permitted under the United States

13  Constitution."  *Id.* (citing Ariz. R. Civ. P. 4.2(a)).  Accordingly, whether this Court has

14  "personal jurisdiction over [Chelsey] is subject to the terms of the Due Process Clause of

15  the Fourteenth Amendment."  *Id.*

16  "Constitutional due process requires that defendants have certain minimum contacts

17  with a forum state such that the maintenance of the suit does not offend traditional notions

18  of fair play and substantial justice."  *Id.* (quotation marks omitted).  Minimum contacts

19  exist "if the defendant has continuous and systematic general business contacts with a

20  forum state (general jurisdiction), or if the defendant has sufficient contacts arising from

21  or related to specific transactions or activities in the forum state (specific jurisdiction)."  *Id.*

22  at 1142 (quotation marks omitted).  "In giving content to that formulation, [courts have]

23  long focused on the nature and extent of the defendant's relationship to the forum State."

24  *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 592 U.S. 351, 358 (2021) (quotation marks

25  omitted).  Courts have specific jurisdiction over a nonresident defendant if three

26  requirements are met:

27
28      (1) the defendant must either "purposefully direct his activities" toward the
        forum or "purposefully avail[ ] himself of the privileges of conducting
        activities in the forum"; (2) "the claim must be one which arises out of or

relates to the defendant's forum-related activities"; and (3) "the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable."

*Axiom Foods, Inc. v. Acerchem Int'l, Inc.*, 874 F.3d 1064, 1068 (9th Cir. 2017) (citation omitted).

## 2.    Discussion

Nikola does not suggest this Court has general jurisdiction over Chelsey and instead argues that specific jurisdiction exists over her in light of Arizona's statute governing community property.  Under Arizona law, "[i]n an action on . . . a debt or obligation the spouses shall be sued jointly and the debt or obligation shall be satisfied[] first, from the community property."  Ariz. Rev. Stat. § 25-215(D).  "Debt incurred by one spouse while acting for the benefit of the marital community is a community obligation whether or not the other spouse approves it."  *Lorenz-Auxier Fin. Grp., Inc. v. Bidewell*, 772 P.2d 41, 43 (Ariz. Ct. App. 1989).  There is a presumption that a spouse's actions "further[] community purposes."  *Id.*  To rebut this presumption, there must be "clear and convincing evidence to the contrary."  *Schlaefer v. Fin. Mgmt. Serv., Inc.*, 996 P.2d 745, 748 (Ariz. Ct. App. 2000).

As set forth below, Nikola has made a prima facie showing of jurisdictional facts here based on the alleged community property at issue.  Accordingly, Chelsey is not entitled to dismissal for lack of personal jurisdiction.

### a.    Purposeful Availment

An individual who chooses to acquire community property in Arizona while married purposefully avails themselves of Arizona law governing and protecting such property.  *See Sw. Foodservice Excellence Inc. v. Strub*, 2020 WL 6323823, at *4–5 (D. Ariz. 2020) (holding that purposeful availment requirement is satisfied where spouse could invoke benefits of Arizona community property law were they to be dismissed).  "Arizona courts have long held that the property rights of a husband and wife are governed by the law of the couple's matrimonial domicile at the time of the acquisition of the property."

1    *Lorenz-Auxier*, 772 P.2d at 43; *see also* Ariz. Rev. Stat. § 25-217 ("Marital rights in

2    property which is acquired in [Arizona] during marriage by persons married [outside of

3    Arizona] who move into the state shall be controlled by the laws of [Arizona]."); *Sw.*

4    *Foodservice*, 2020 WL 6323823, at *4 ("Prior to moving to Indiana, [the defendants] lived

5    in Arizona as a married couple and accumulated community property under Arizona law.

6    Arizona law continues to govern this property despite the couple's relocation." (footnote

7    omitted)).

8         Although the Miltons currently reside in Utah, which is not a community property

9    state, Nikola has persuasively argued—and submitted unrebutted evidence—that,

10   construed in a light most favorable to Nikola, the Miltons were residents of Arizona and

11   had at least some property that became community property during that time.  (*See* Doc.

12   69 at 5–6 & n.9; Doc. 69-2 at 2–4; Doc. 69-4 at 2–3; Doc. 69-8 at 5.)  Nikola submitted an

13   affidavit of its counsel and several documents of public record involving the Miltons'

14   property, including a quit claim deed in which the Miltons transferred real property located

15   in Arizona to an Arizona LLC.  (Doc. 69-2 at 2–4.)  This real property is the same address

16   listed as Trevor's current address in M&M's records, according to Nevada public record,

17   and, indeed, Trevor admitted in a different case in this District that he was previously a

18   resident of Arizona.  (*See* Doc. 1 ¶ 18, *Milton v. Nikola Corp.*, 2:24-cv-01359-SPL (June

19   6, 2024).)  Chelsey was previously a manager and member of this same Arizona LLC

20   holding the Arizona real property.  (Doc. 69-6 at 2.)

21        At oral argument, Chelsey argued for the first time that, simply because Trevor was

22   an Arizona resident does not mean she also was an Arizona resident, even if she owned

23   real property in Arizona.  Chelsey did not offer any authority or evidence in support—

24   including in her briefing—and arguments raised for the first time at oral argument are not

25   considered.  *See Rice Corp. v. Grain Bd. of Iraq*, 582 F. Supp. 2d 1309, 1313 (E.D. Cal.

26   2008).  Moreover, at oral argument, Chelsey implied that she may have moved to and lived

27   in Arizona, but that she did not necessarily intend to establish her domicile here and that

28   any property is not necessarily marital property.  Again, this was not argued in her briefing,

1    but her insinuations support Nikola's argument that the Miltons lived in Arizona and
2    acquired property during that time.

3    Finally, it is worth noting that Nikola agreed at oral argument to dismiss Chelsey as
4    a defendant if she would not raise A.R.S. § 25-215 as a defense to enforcement if Nikola
5    obtained a judgment.  Nikola stated that it only named her as a defendant to give Chelsey
6    the protections of Section 25-215 to which Nikola believes Chelsey is entitled with respect
7    to any community property.  When asked whether she would agree to not raise any defenses
8    arising from Arizona community property law, Chelsey refused.  Although not dispositive,
9    Chelsey's refusal suggests that she believes she may have community property that would
10   benefit from the protections of Section 25-215.

11   For these reasons, Nikola's evidence, taken together and construed in a light most
12   favorable to Nikola, sufficiently meets its burden of establishing that Chelsey resided in
13   Arizona and acquired property that became community property.   Accordingly, the
14   purposeful availment requirement is satisfied.

### b.      Relation of Claims to Forum-Related Activities

16   The second requirement for specific jurisdiction to lie is that the asserted claims
17   must "arise out of" or "relate to" a defendant's forum-related activities.  Nikola frames this
18   analysis as whether the subject property (here, Trevor's Nikola stock) is community
19   property, (Doc. 69 at 6–7), but "the proper inquiry is whether [the plaintiff's] claims arise
20   out of or relate to [the spouse defendant's] marital community," which is determined by
21   whether community property will be implicated by a judgment in Nikola's favor, *see Sw.
22   Foodservice*, 2020 WL 6323823, at *5 (exercising personal jurisdiction over a spouse "in
23   connection with [the plaintiffs'] claims for damages" that would be recovered from the
24   marital community, but not equitable relief "not recoverable from the marital community").
25   In the context of a claim against a spouse, the inquiry requires assessing the nature of the
26   claim asserted and its intersection with Arizona law governing community property.

27   Nikola concedes that its AUFTA claim "sounds in tort," (Doc. 69 at 6), and this and
28   other courts have held that claims for fraudulent transfers or conveyances are intentional

torts, *see, e.g.*, *In re GBG USA Inc.*, 666 B.R. 115, 133 (Bankr. S.D.N.Y. 2024); *N.J. Dep't of Env't Prot. v. E.I. du Pont de Nemours & Co.*, 2021 WL 6064842, at *8 (D.N.J. 2021); *Best W. Int'l Inc. v. I-70 Hotel Corp.*, 2012 WL 2952363, at *2 (D. Ariz. 2012).  "In the area of intentional torts, the community is not liable for one spouse's malicious acts unless it is specifically shown that the other spouse consented to the act or that the community benefited from it." *Selby v. Savard*, 655 P.2d 342, 349 (Ariz. 1982).  But "[b]enefit to the community need not be the primary object or intention."  *Cadwell v. Cadwell*, 616 P.2d 920, 923 (Ariz. Ct. App. 1980).  Rather, "[a]ll that is required is that some benefit was intended for the community," not that the community actually received a benefit.  *Id.*; *Selby*, 655 P.2d at 349.  Accordingly, for the Miltons' community property to be liable, either (a) Trevor must have benefited or intended to benefit the community through the alleged fraudulent transfers, or (b) Chelsey must have consented to the transfers.  *Selby*, 655 P.2d at 349; *Cadwell*, 616 P.2d at 923. Chelsey argues "Nikola does not allege any facts indicating that [she] had any knowledge of the Transfers, let alone consented to them, or that the Miltons' marital community benefited from them."  (Doc. 68 at 5.)

Nikola does not dispute that it has not alleged Chelsey consented or otherwise ratified the alleged fraudulent transfers.  (*See generally* Doc. 65.)  The question then is whether the alleged fraudulent transfers benefited or were intended to benefit the community in some way.  *Selby*, 655 P.2d at 349; *Cadwell*, 616 P.2d at 923.  The Court cannot conclude  at this stage that Trevor did not intend to benefit his marital community by making the alleged transfers, or that the community did not benefit.  *Cf. Gagan v. Monroe*, 269 F.3d 871, 874 (7th Cir. 2001) (stating that a spouse's "fraudulent conduct, if successful, would have enriched the marital community, and . . . under Arizona law it would be treated as a community debt"); *In re Oliphant*, 221 B.R. 506, 509 (Bankr. D. Ariz. 1998) ("[T]he pre-existing community was liable under state law because there was no dispute the community benefitted from [one spouse's] embezzlement."); *Essex Eng'g Co. v. Credit Vending, Inc.*, 732 F. Supp. 311, 314–15 (D. Conn. 1990) (applying Arizona law and stating that "[s]ince all of the [married couple's] property is claimed to be

community property, it follows that the fruits of [the husband's] business dealings would inure to the benefit of the community").  If the alleged fraudulent transfers did occur and Trevor intended to take property out of reach from creditors, this would have benefited the marital community by allowing it to retain property that otherwise would be used to satisfy a creditor's claims.  *Gagan*, 269 F.3d at 874; *Essex Eng'g*, 732 F. Supp. at 314–15.  Nikola has sufficiently pled that the marital community benefited or was intended to benefit from the alleged fraudulent transfers.

Thus, to the extent Nikola will attempt to recover any judgment from community property that has retained its community character, the claim relates to Chelsey's forum-related activities and the Court properly has personal jurisdiction over her.  Nikola's requested relief is mixed—it seeks (1) an injunction that would restrict Trevor from disposing of any assets until he satisfies Nikola's judgment; (2) an order setting aside the alleged fraudulent transfers; (3) an order of attachment against the transferred assets; (4) an order of garnishment against the fraudulent transferee; (5) a levy of execution on the transferred assets or their proceeds; and (6) attorneys' fees and costs.  (Doc. 65 at 13–14.)

At least some of this relief may affect or implicate community property, or its proceeds, so the Court agrees that Nikola's claim relates to the marital community such that Nikola has made a prima facie showing that Chelsey's contacts subject her to the Court's personal jurisdiction.  *See* Ariz. Rev. Stat. § 25-215(C) (providing that "community property is liable for a spouse's debts incurred outside of [Arizona] during the marriage which would have been community debts if incurred in [Arizona]"); *In re Mantle*, 153 F.3d 1082, 1085 (9th Cir. 1998) (stating under California law that "the proceeds from the sale of the community property . . . remained community property");[8] *Henson v. Air Nat'l Guard Air Force Reserve Command Test Ctr.*, 2007 WL 2903993, at \*5–6 (D. Ariz. 2007) (determining that spouse should be joined as a party where attorneys' fee award could be satisfied by community property); *Eng v. Stein*, 599 P.2d 796, 799 (Ariz. 1979) (both

---

[8]    *See Gaethje v. Gaethje*, 441 P.2d 579, 583 (Ariz. Ct. App. 1968) (indicating "community property decisions" of states like California can be persuasive in "determining the community property law of [Arizona]").

spouses were required to be joined to foreclose lien on community property); *see also Rincon*, 2022 WL 4115683, at *2; *Sw. Foodservice*, 2020 WL 6323823, at *5 ("By choosing to accumulate property as a married couple, [the non-resident spouse] purposefully availed herself of Arizona law governing and protecting such property.  This protection endures.  But so, too, does, [her] contact with Arizona, which persists in lockstep to this protection."); *High Purity D.R.A.W., Inc. v. Sanveo, Inc.*, 2017 WL 4652203, at *8 (D. Ariz. 2017) (denying non-resident spouses' motion to dismiss for lack of personal jurisdiction because "it [was] likely that they [had] acquired community property at some point in their marriages" and the court had "personal jurisdiction over their husbands").

Chelsey argues that Arizona law does not provide that "any person married to a tortfeasor can also be held liable," (Doc. 70 at 3), but Nikola is not attempting to hold Chelsey individually liable for Trevor's alleged conduct.  Rather, Nikola seeks to execute any judgment against community property, meaning that Chelsey is a required party under Arizona law.  Ariz. Rev. Stat. § 25-215(C)–(D).  Because Nikola has made a prima facie showing of jurisdictional facts here, and Chelsey did not otherwise argue that exercising personal jurisdiction would be unreasonable, the Court denies her motion to dismiss for lack of personal jurisdiction.  *See Sketchy Studios, LLC v. Frame Rates, Inc.*, 2017 WL 11635473, at *3 (C.D. Cal. 2017) (denying motion to dismiss because once the plaintiff "made a prima facie showing of personal jurisdiction, the burden shift[ed] to [the defendant] to demonstrate why exercising personal jurisdiction over him would be unreasonable," and the defendant made "no such showing").

## B.    Failure to State a Claim

Chelsey argues that, even if this Court has personal jurisdiction over her, she should still be dismissed because an AUFTA claim may "only be asserted against a transferor, transferee, and/or beneficiary of the transfers," and Chelsey is "not a transferor or transferee." (Doc. 68 at 4–5.)  She further argues that Nikola has not sufficiently pled that she "(or the marital community) is somehow a beneficiary of the Transfers." (*Id.* at 5.) Nikola responds that "the notion that the Milton's [sic] marital community would not have

1  benefited from Mr. Milton receiving tens of millions of shares of Nikola stock . . . defies

2  common sense." (Doc. 69 at 8.)

3        Nikola joined Chelsey as a party to be able to reach community property if it prevails

4  in this action. (*Id.* at 1.)  As explained above, at this pleading stage Nikola has made a

5  sufficient showing of jurisdictional facts that community property is implicated such that

6  Chelsey was required to be joined as a party under Arizona law.  Accordingly, the AUFTA

7  claim need not be made against her directly. *See, e.g.*, *R. Prasad Indus. v. Flat Irons Env't*

8  *Sols. Corp.*, 2013 WL 2217831, at *5 (D. Ariz. 2013) ("Although the spouses are not

9  alleged to have committed or even been aware of the actions alleged in the Complaint,

10  under Arizona law, spouses must be sued jointly in order to reach assets of community

11  property.  Accordingly, [the plaintiff] has properly named [the spouses] as defendants."

12  (citations omitted)).  The Court therefore denies her request because Nikola has stated a

13  claim against her. *See, e.g.*, *Harmon v. RAR Enters., Inc.*, 2011 WL 2175063, at *3 (D.

14  Ariz. 2011) ("[S]ince Arizona law requires joining the spouse to obtain community

15  property assets to satisfy a judgment, plaintiff has stated a claim against [the wife].").

16        Accordingly,

17        **IT IS ORDERED** that Trevor Milton's motion to dismiss the amended complaint

18  (Doc. 50) is **denied**.

19        **IT IS FURTHER ORDERED** that Chelsey Milton's motion to dismiss (Doc. 68)

20  is **denied**.

21        Dated this 21st day of August, 2025.

22

23

24                                                    _____

25                                                    Honorable Sharad H. Desai
                                                      United States District Judge
26

27

28